Banks, J.
This matter involves a controversy over the respective rights and obligations of two joint owners of “rental property” which arose when one ceased to be, and the other continued to be, an occupant of the premises.
The parties in this action, Theodore Live and Nancy Woods (now Bellows) purchased jointly a three-family dwelling at 4 Hastings Square, Cambridge, Mass, where they resided together in one apartment and rented the other two. Pursuant to a written Ownership Agreement dated January 16, 1979, the parties shared rent and expenses on a “fifty-fifty” basis. No problem with regard to their respective interests in the property arose during that period when both parties occupied the premises.
A change in the parties’ relationship, however, resulted in plaintiff Live’s departure from the premises on December 3,1980. For the ensuing nineteen months, Live paid rent for his occupancy of other premises, and contributed only sporadically to the defrayment of the expenses of the parties’ jointly owned property. Defendant Woods continued to reside in the apartment both parties had formerly occupied. Plaintiff Live returned to a separate apartment at 4 Hastings Square on July 1, 1982 and remained until May 31, 1983. Defendant Woods ultimately purchased the property at private auction, and the parties’ tenancy-in-common was thereby terminated in November, 1982.
Live thereafter initiated the present suit to recover rent for defendant Woods’ sole occupancy of the premises (in the amount of one-half of the fair market rental value of the apartment) during the nineteen month period of Live’s absence. Woods counterclaimed for a balance owed by Live for his proportionate share of the net operating expenses of the property for the same nineteen month period.
The trial court entered judgment for defendant Woods on plaintiff Live’s complaint. Live did not-appeal this finding. The trial court also entered judgment for defendant-in-counterclaim Live on Woods’ counterclaim. On December 7, 1987, Woods filed a timely request for report and draft report challenging the trial court’s disposition of her counterclaim. A final report was not settled and signed by the trial justice until April 13,1987.
1. The passage of more than four months from the filing of plaintiff-in-counterclaim Woods’ draft report to the settlement of a final report by the trial *172 justice raises a preliminary procedural question as to the viability of this appeal. Defendant-in-counterclaim Live challenges the propriety of any appellate review of this case on the grounds that Woods’ appeal expired three months after the filing of her draft report pursuant to the following provision of Dist./Mun. Cts. R. Civ. P., Rule 64 (c) (5):
If final action by the trial judge upon any draft report... is not taken within three months after the filing thereof, and no petition for establishment of a report has been filed, the cause shall proceed as though no request for report had been made, unless the appellate division for cause shown shall allow further time.
It is clear that a report was not settled in this case within the three month period prescribed by Rule 64 (c) (5), and that appellant Woods failed to preserve her right to appeal either by filing a petition to establish a report or by requesting additional time for report settlement. O’Connell & Co., Inc. v. Gassett, 1986 Mass. App. Div. 160. The appellant’s forfeiture of any claim to be heard as of right by this Division does not, however, preclude the possibility that her appeal may be heard at the discretion of this Division. In Hough v. Newton, 1985 Mass. App. Div. 8, we construed Dist./Mun. Cts. R. Civ. P., Rule 64 (c) (5) “to signify that at the expiration of the [Rule 64 (c) (5) ] three month period, a draft report remains in a ‘pending’ state subject to dismissal. .. P Id. at 11, upon motion in the trial court. An appeal is thus not automatically extinguished upon the expiration of the three month period, but may still be entertained if, and only if, the Appellate Division permits an enlargement of time for report settlement as provided in Rule 64 (c) (5).
The question posited by this appeal is whether a request for additional time must be made formally by the appellant prior to the expiration of the three month period, or whether the Appellate Division may exercise its power to excuse the tardiness of a report at any time up to the date of hearing. Consistent with Hough, we conclude that the “pending” status of the appeal permits the relaxation of the time requirements of Rule 64 (c) (5) in the discretion of the Appellate Division at any time for cause shown. In the instant case, we find that the interest of justice is better served by entertaining the appeal, and, accordingly, proceed to the merits of appellant Woods’ arguments.[2] 2. As noted, plaintiff Live did not request a report to this Division to obtain review of the trial court’s judgment for defendant Woods on the principal complaint.-The scope of this appeal is, therefore, restricted to a consideration of Woods’ allegations of error in the trial court’s judgment in favor of defendant-in-counterclaim Live.
The only evidence relevant to defendant Woods’ counterclaim which was reported to this Division is contained in the following summary, prepared by the trial court, of joint stipulations by the parties:
1. Ted Live and Nancy Woods entered into an Ownership Agreement, dated January 16, 1979 to own and reside in 4 Hastings Square, Cambridge, Massachusetts as tenants-in-common. The parties did own 4 Hastings Square as tenants-in-common.
2. Part I of the Ownership Agreement of January 16, 1979 stated: ‘They will share approximately equally the cost of maintenance and *173 operation of the premises, including repairs, taxes, insurance and mortgage amortization, and will divide equally the net proceeds of rentals and of allowable income tax deductions....’
3. Part II of the Ownership Agreement of January 16,1979 set forth: “The obligation under Paragraph I above will be not reduced or abated in the event that either party ceases to reside in the premises.’
4. On December 2, 1980, both parties signed an Addendum to the Ownership Agreement of January 16, 1979 providing for a new Ownership Agreement to be entered by March 1,1981. Discussions continued beyond this time by agreement of the parties.
5. In line with the December 2, 1980 Addendum, and as an accommodation to the Defendant, Plaintiff agreed to temporarily move from the premises. At the time Plaintiff left, the basement apartment was available. Plaintiff testified he declined to move into the basement apartment for two reasons: (1) the psychological difficulty of remaining in the same building with Defendant; (2) the basement apartment was inadequate.
6. Ted Live vacated the premises pursuant to the Agreement on December 3,1980. Up to December 3,1980, the date Ted Live vacated, Live and Woods shared expenses equally. The parties had established a joint house account and deposited an agreed upon amount in the account each month.
7. During the period from December 1980 through December 1982, the parties attempted in vain to reach a new agreement for the ownership and occupancy of the property, including the respective financial obligations of the parties.
8. After moving out, Ted Live paid rent elsewhere and did contribute to house expenses, maintenance, upkeep, etc. at 4 Hastings Square the total of $615.18 over and above his share of rents received.
9. During the absence of Ted Live, Nancy Woods paid all house expenses from the house account, including mortage insurance, tax, utilities, general maintenance and upkeep.
10. Ted Live moved back to 4 Hastings Square on or about July 1,1982 in preparation for the sale of the property. He lived in a Separate Unit from Nancy Woods. Ted Live remained on the premises until approximately May 31,1983.
11. In November of 1982, a private auction was held to sell the property to the highest bidder between Woods and Live. Both parties were represented by counsel. The house was sold to Nancy Woods, the highest bidder.
12. The parties kept a joint house account under the names of Bellows and Live, at Baybank Harvard Trust, Account No. 003 64365. •This account was closed by Nancy Woods (Bellows) on or about March 12, 1983. Nancy Woods paid Ted Live on March 19, 1983, $600.45. This amount was one-half the amount in the account at that time.
13. Ted Live’s absence from 4 Hastings Square was for appoximately 19 months, that is from 12/3/80 through approximately 7/1/82.
14. Nancy Woods’ monthly expenses during the 19-month absence of Ted Live were as follows:
a) mortgage and tax payments, $12,461.89;
b) insurance payments, $2,032.81;
*174 c) utility payments, $3,675.22;
d) general maintenance and upkeep payments, $1,601.49;
e) loan, $1,702.40
Total: $21,473.81
15. During Ted Live’s absence, the rents received by Nancy Woods and Ted Live were as follows: $12,950.00.
In enteringjudgmentfor defendant-in-counterclaim Live upon Woods’ counterclaim, the trial court made the following dispositions of Woods’ requests for rulings of law:
4. The evidence is not sufficient to warrant a finding for the Defendant in Counterclaim upon .the Plaintiff in Counterclaim’s action.
DENIED.
5. There was no ouster of Ted Live in this case.
ALLOWED.
6. Absent an agreement to pay rent or an ouster, an occupying tenant-in-common has no obligation to pay rent to a non-occupying tenant-in-common.
ALLOWED.
7. Under the Ownership Agreement signed by both parties, Ted Live was obliged to continue paying approximately one-half the expenses of 4 Hastings Square during his absence, and to share one-half the profits.
ALLOWED.
Plaintiff-in-counterclaim Wood’s fourth request for ruling of law sought a determination that she was entitled as a matter of law to a finding in her favor on the counterclaim. We hold that the evidence introduced at trial and reported to this Division did not permit a finding for defendant-in-counterclaim Live, and that the court’s denial of request for ruling number 4 was thus error. Anapolle v. Carver, 327 Mass. 344, 346 (1951).
The counterclaim in question sought recovery of a balance owed by Live for his share of the net operating expenses of the parties’ property for the nineteen month period during which he resided elsewhere. Part I of the parties’ written Ownership Agreement imposed an obligation on both Woods and Live to pay approximately equal shares of the costs of maintaining and operating their jointly owned property. By the express, unambiguous terms of Part II of the Ownership Agreement, such obligation would “not be reduced or abated in the event that either party cease [d] to reside in the premises.” All contracts, including the parties’ Ownership Agreement, must be construed and enforced as written. See, generally, Freelander v. G & K Realty Corp., 357 Mass. 512, 515-516 (170); Precision Instrument Corp. v. Jolicoeur, 37 Mass. App. Dec. 47, 49 (1967). Pursuant to the clear and specific terms of the parties’ written contract, defendant-in-counterclaim Live remained liable for fifty percent of all property expenses arising during the nineteen month period in which.he did not occupy the premises. It is this obligation which Woods seeks to enforce by way of her counterclaim.
Live’s contractual obligation was recognized by the trial court in its allowance of request for ruling number 7. No evidence was introduced by Live to alter the dispositive effect of Part II of the Ownership Agreement on Woods’ counterclaim. The report is devoid of even a suggestion that this contractual provision was the result of fraud, duress or mistake. .Both parties also stipulated that negotiations for a newownlership agreement never culminated in a modification, reformation or termination of their original contract. In short, the reported evidence did not permit a finding that Live was in anyway *175 entitled to be released from his contractual obligations. Despite any unilateral intent or belief that his departure from the premises in December, 1980 would eventually result in a modification of the parties’ contractual undertaking, Live remained bound by the plain terms of the parties’ Ownership Agreement. See, generally, Hiller v. Submarine Signal Co., 325 Mass. 546, 550 (1950).
Accordingly, the trial court’s judgment for defendant-in-counterclaim Live is reversed. Judgment for plaintiff-in-counterclaim Woods in the amount of $3,646.72[3] is to be entered. So ordered.

Entering into this decision are such factors as the relatively small amount of additional time taken for report settlement by the trial court, the apparent absence of any dilatory or inexcusably negligent conduct by the appellant, and the existence of a substantial question of law as to the correctness of the judgment. This list of factors is neither definitive, nor exhaustive; and it should be understood that any claim of appeal which is allowed to fall outside the time parameters of Rule 64 (c) (5) will be entertained, if at all, solely upon a favorable evaluation of the specific factors in that case.

The amount of damages was derived from the parties’ stipulations.